IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 4:25-cv-00348 |
| | ) | |
| v. | ) | |
| | ) | VERIFIED COMPLAINT FOR |
| VIRTUAL CURRENCY SEIZED | ) | FORFEITURE IN REM |
| FROM BINANCE USER ID 57857721 | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, United States of America, hereby files and serves this VERIFIED COMPLAINT IN REM and alleges as follows:

## I.    NATURE OF THE ACTION

1.    This is an action to forfeit specific property, described as approximately 275,912.256745 Tether (USDT) virtual currency seized from BAM Trading Services, Inc., d/b/a Binance.us User ID 57857721 (hereinafter the "Defendant Property") to the use and benefit of the United States of America for its involvement, as set forth below, in violations of 18 U.S.C. §§ 1956 and 1957.

2.    The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as personal property involved in a financial transaction or attempted financial transaction involving the proceeds of wire fraud, a specified unlawful activity,  knowingly designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the wire fraud proceeds, or property traceable to such property, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

3.    The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as personal property involved in a monetary transaction in criminally derived property of a value greater than $10,000 derived from a specified unlawful activity, or property traceable to such property, in violation of 18 U.S.C. § 1957(a).

## II.    DEFENDANT IN REM

4.    The Defendant Property consists of 275,912.256745 Tether (hereinafter "USDT") valued at approximately $275,000.00, which was seized from User ID 57857721 located at BAM Trading Services, Inc., d/b/a Binance.us (hereinafter "Binance") pursuant to a federal seizure warrant issued on May 27, 2025. Plaintiff notes the value of the Defendant Property fluctuates and at any given time may be more or less than the value set forth above.

## III.    JURISDICTION AND VENUE

5.    This Court has jurisdiction over this civil action commenced by Plaintiff under 28 U.S.C. § 1345 and over this action for forfeiture under 28 U.S.C. § 1355(a).

6.    This Court has in rem jurisdiction and venue over the Defendant Property under 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

## IV.    FACTS

### A.    Background On Virtual Currencies and Transaction Analysis

7.    Virtual currencies are digital tokens of value circulated over the Internet as substitutes for traditional government-issued, or "fiat", currency.

8.     Virtual currencies are not issued by any government or bank like traditional fiat currencies such as the U.S. dollar but are generated and controlled through computer software.

9.     Bitcoin (or BTC) is currently one of the most popular virtual currencies in use. Other relevant popular virtual currencies include Ether (ETH) and Tether (USDT).

10.     Virtual currency addresses are the digital locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

11.     Virtual currency exchanges, also known as Virtual Asset Service Providers (VASPs), like Binance.us, are trading and/or storage platforms for virtual currencies, such as BTC, ETH, USDT, and many others. Many exchanges also store their customers' virtual currency in virtual currency accounts. These virtual currency accounts are commonly referred to as wallets and can hold multiple virtual currency addresses.

12.     Many virtual currencies, including BTC, ETH, and USDT, publicly record all their transactions on what is known as a blockchain.

13.     The blockchain is a distributed public ledger containing an immutable and historical record of every transaction utilizing that blockchain's technology.

14.     The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual

currency address. There are different blockchains for different types of virtual currencies.

15.    Blockchain explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. The blockchain explorer uses a database to arrange and present the data to a user in a searchable format.

16.    While the identity of a virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (e.g., the BTC blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity.

17.    Over the course of this investigation, the FBI conducted detailed blockchain analysis.

18.    In addition to using publicly available blockchain explorers, law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies analyze virtual currency blockchains and attempt to identify relationships between transactions, wallets, and accounts in a manner that allows for them to be linked to groups or individuals (although the exact identity of the underlying individuals is not available on the blockchain).

19.    Through numerous unrelated investigations, law enforcement has found the information provided by these companies to be reliable. Law enforcement can then use its own investigative means to identify specific individuals.

20.     In the training and experience of law enforcement officers who worked on this investigation, actors who illicitly use virtual currency know that most virtual currency blockchains are public and can be traced by law enforcement and others using blockchain analytics tools. Therefore, these criminal actors do their best to launder their criminal proceeds through a variety of means, including splitting up virtual currency criminal proceeds into smaller amounts, which are then shuffled through numerous other addresses before being transferred to a virtual currency exchange, where they can be converted to another type of virtual currency or fiat currency and then withdrawn.

## B.     Romance and Inheritance Fraud Schemes

21.     Based on training, experience, and collaboration with other law enforcement officers, the investigators on this case know that certain fraudulent schemes combine elements of romance and inheritance scams. Fraudsters use these hybrid schemes exploit victims' emotions and trust to illicitly obtain substantial sums of money.

22.     In such schemes, fraudsters typically initiate contact with victims through online dating platforms, social media, or messaging applications, often posing as individuals such as military personnel or professionals working abroad.

23.     Once an emotional connection is established between a fraudster and his/her target, the fraudster introduces a fabricated narrative involving a substantial inheritance that they are unable to access due to legal or bureaucratic hurdles and/or financial difficulty.

24.    The fraudster then solicits financial assistance from the target to cover fees, taxes, or other expenses purportedly required to release the inheritance.

25.    These scams often involve the use of forged documents, impersonation of legitimate entities, and manipulation of victims' emotions to elicit compliance.

26.    Funds obtained through these fraudulent means are frequently laundered through complex networks, including the use of money mules,[1] international financial institutions, and cryptocurrency transactions to obscure the origin and destination of the proceeds.

### C.    Events Leading to The Seizure

27.    According to the records of the Altoona, Iowa Police Department, on August 28, 2024, a 71-year-old Altoona, Iowa resident (hereinafter "VICTIM #1") reported that he had been defrauded or scammed out of $570,000.

28.    VICTIM #1 explained that he met a female in 2023 on the Internet dating site "Match.com" who claimed her name was "Theresa Emily Ginger" (hereinafter "GINGER"). VICTIM #1 developed a close online relationship with GINGER and communicated with her frequently via text messaging and emails.

29.    VICTIM #1 never met GINGER in person or talked with her over the phone.

30.    VICTIM #1 provided investigators with the Facebook profile for GINGER, which was identified as using the name "Theresa Ginger."

---

[1] A money mule is someone who transfers or moves illegally acquired money on behalf of someone else.

31.    Investigators conducted reverse image searches of the photographs associated with "GINGER's" Facebook profile. The searches revealed that the images were stock photographs used in various advertisements and publicly available online. This indicated that the profile utilized images not unique to an individual, suggesting that the identity presented was fictitious and consistent with tactics employed in romance scam operations.

32.    According to information VICTIM #1 provided to the Altoona Police Department, GINGER started asking VICTIM #1 around March 2024 to send $330,000 to pay taxes and fees to facilitate the release of a purported $23,000,000 inheritance from GINGER's grandfather.

33.    GINGER claimed the inheritance funds were being held by the HM Treasury (UK Ministry of Finance/Bank of England) and the UK Government Goodwill Account.

34.    VICTIM #1 believed GINGER when he/she said he/she was a live-in caregiver for an elderly aunt.

35.    In May 2024, VICTIM #1 agreed to loan GINGER $330,000 to pay the taxes and fees needed to get the $23,000,000 inheritance. GINGER promised to repay VICTIM #1 double the amount of the loan once they received the inheritance.

36.    At GINGER's direction, VICTIM #1 wrote two checks totaling $330,000 payable to WG Finances LLC.

37.    WG Finances LLC was allegedly the financial firm representing GINGER.

38.    GINGER told VICTIM #1 the inheritance was released to the United States but was put on hold pending receipt of a clearance certificate regarding anti-money laundering and anti-terrorism concerns, and $287,809.15 in fees would need to be paid to lift the hold.

39.    GINGER convinced VICTIM #1 to loan her approximately $287,809.15 for the payment of fees.

40.    At GINGER's instruction, VICTIM #1 wrote two checks totaling $240,000 payable to John Solotes (hereinafter "SOLOTES") in August 2024. GINGER told VICTIM #1 that SOLOTES was a representative of WG Finances LLC.

41.    Thereafter, VICTIM #1 received a phone call from Peoples Bank in Mississippi who told VICTIM #1 that SOLOTES had an account at Peoples Bank where he attempted to cash VICTIM #1's two large checks.

42.    Peoples Bank refused to cash the checks and advised VICTIM #1 that VICTIM #1 had fallen victim to a scam. This prompted VICTIM #1 to contact the Altoona Police Department to file a police report.

43.    On October 18, 2024, the Iowa Insurance Division (IID) received a complaint from the Financial Industry Regulatory Authority (FINRA). The complaint stated that VICTIM #1 contacted a FINRA Securities Helpline for seniors on July 29, 2024, claiming to be a potential victim of a romance scam.

44.    On March 21, 2025, IID contacted VICTIM #1 to follow up on the complaint received by FINRA.

45.    VICTIM #1 told investigators that VICTIM #1 established an online relationship with GINGER.

46.    Believing he was assisting GINGER in securing GINGER's grandfather's inheritance, VICTIM #1 sent approximately $642,000 in personal checks to addresses in Mississippi and Virginia at the direction of GINGER.

47.    VICTIM #1 sent these checks because he was under the impression that the recipients were affiliated with a company purportedly responsible for releasing GINGER's inheritance.

48.    In addition to the checks, VICTIM #1 provided funds to GINGER by purchasing gift cards.

49.    VICTIM #1 also made unsuccessful attempts to send money via the cryptocurrency platforms Gemini and CoinFlip. Specifically, VICTIM #1 deposited $300 into his CoinFlip wallet and purchased cryptocurrency but did not complete any transfers.

50.    VICTIM #1 stated the funds he provided to GINGER were sourced from VICTIM #1's Individual Retirement Account (IRA).

51.    Furthermore, VICTIM #1 secured a $75,000 Home Equity Line of Credit to obtain additional funds to provide to GINGER.

52.    As of April 17, 2025, VICTIM #1 reported ongoing daily communication with GINGER through text messages. He believed that GINGER was in Glasgow, Scotland, attending to a sick relative who had recently passed away. GINGER

requested an additional $10,000 from VICTIM #1 to purportedly cover outstanding loans and medical bills.

53.    During the investigation, VICTIM #1 provided investigators with copies of various documents and bank records. These records included five checks, totaling $643,101.10 that VICTIM #1 mailed—per GINGER's instructions—to William Gallagher LLC, c/o Esther, 5226 Texas Ave., Norfolk, VA 23513.

54.    The following five checks all cleared from VICTIM #1's bank accounts:

| Check Date | Bank Account | Check # | Payable to | Amount |
|---|---|---|---|---|
| 6/17/2024 | US Bank x2680 | 1006 | William Gallagher LLC | $142,844.29 |
| 6/17/2024 | US Bank x2680 | 1007 | William Gallagher LLC | $187,755.71 |
| 9/7/2024 | Veridian Credit Union x4063 | 108 | William Gallagher LLC | $108,800.29 |
| 9/7/2024 | Veridian Credit Union x4063 | 109 | William Gallagher LLC | $131,700.81 |
| 11/27/2024 | Veridian Credit Union x4063 | 115 | William Gallagher LLC | $72,000.00 |

55.    Veridian Credit Union records obtained by investigators for VICTIM #1's account showed the following:

a.    Check #108, dated September 7, 2024, and payable to William Gallagher LLC for $108,800.29, was negotiated at Southern Bank & Trust Company on September 13, 2024;

b.    Check #109, dated September 7, 2024, and payable to William Gallagher LLC for $131,700.81, was negotiated at Woodforest National Bank on September 12, 2024; and

c.    Check #115, dated November 27, 2024, and payable to William Gallagher LLC for $72,000, was negotiated at Woodforest National Bank on December 12, 2024.

**D.    Southern Bank & Trust Deposits**

56.    Southern Bank & Trust records obtained by investigators showed that William Gallagher (hereinafter "GALLAGHER") opened two accounts on September 13, 2024:

    a.    a business checking account x5656 with account name WILLIAMGALLAGHER LLC; and

    b.    a personal checking account x0598 with account name WILLIAM JAMES GALLAGHER.

57.    On the same day, GALLAGHER deposited VICTIM #1's Veridian Credit Union check #108 for $108,800.29 into business account x5656.

58.    From September 24, 2024, to October 15, 2024, GALLAGHER transferred $105,000 from business account x5656 to personal account x0598.

59.    On September 30, 2024, GALLAGHER sent $10,000 to the cryptocurrency exchange Payward Interactive, Inc. (also known as Kraken) and $15,000 to the cryptocurrency exchange Coinbase Global, Inc. (also known as Coinbase) from account x0598.

60.    On October 1, 2024, GALLAGHER wired $40,000 from account x0598 to Coinbase.

61.    On October 18, 2024, GALLAGHER wired $80,000 to Kraken from account x0598.

62.    On November 1, 2024, the $80,000 wire was returned.

63.    On November 6, 2024, GALLAGHER closed both accounts.

### E.    Woodforest National Bank Deposits

64.    Veridian Credit Union records showed that two checks were negotiated at Woodforest National Bank:

      a.    Check # 109, dated September 7, 2024, and payable to William Gallagher LLC for $131,700.81, was negotiated at Woodforest National Bank on September 12, 2024; and

      b.    Check #115, dated November 27, 2024, and payable to William Gallagher LLC for $72,000, was negotiated at Woodforest National Bank on December 1, 2024.

65.    GALLAGHER linked his Woodforest National Bank account to Gemini account 7666547. Gemini is a cryptocurrency platform.

66.    GALLAGHER created the Gemini account on January 4, 2024.

67.    Records from Gemini show that between January 5, 2024, and July 15, 2024, GALLAGHER's Gemini account received eight fiat currency deposits from his Woodforest National Bank account totaling approximately $483,000, including deposits of:

      a.    $100,000 on January 5, 2024;

      b.    $60,000 on January 9, 2024;

      c.    $15,000 on July 2, 2024;

      d.    $70,000 on July 3, 2024;

      e.    $125,000 on July 8, 2024;

      f.    $15,000 on July 10, 2024;

      g.    $85,000 on July 15, 2024; and

      h.    $13,000 on July 15, 2024.

68.    Gemini records confirmed that after each deposit of fiat currency into the account, the fiat currency was used to purchase BTC and, in most instances, the BTC was transferred out of the account, all on the same day as the initial deposit.

### F.    Identification of the TARGET ACCOUNT

69.    Law enforcement traced a total of approximately $178,000 in various cryptocurrency transfers of the victim funds from GALLAGHER's Kraken, Coinbase, and Gemini accounts to the Binance cryptocurrency address 1FcGG22A9awagBbP5s3CGvS1C2DRYTQhLy (1FcGG22A...QhLy) (the "TARGET ACCOUNT").

70.    On April 17, 2025, investigators contacted Binance, seeking account and ownership information associated with the TARGET ACCOUNT. Binance was also asked to voluntarily restrain or freeze funds in the TARGET ACCOUNT.

71.    On April 17, 2025, Binance confirmed that all funds or assets in the TARGET ACCOUNT were frozen and provided a spreadsheet that contained the requested account information. The Binance account associated with the cryptocurrency address 1FcGG22A...QhLy was identified as Binance User ID 57857721.

72.    According to Binance customer records, the TARGET ACCOUNT, created on November 12, 2021, belonged to Folorunso Falaju (hereinafter "FALAJU"), who registered for the account using email address oceanorion@outlook.com and Michigan state-issued identification.

73.    Binance records showed that FALAJU's account contained several cryptocurrency wallets, including 1FcGG22A...QhLy.

74.    Binance.us records showed that, on October 14, 2024, at 14:48 UTC, the TARGET ACCOUNT received a deposit of 0.15646002 BTC into cryptocurrency wallet 1FcGG22A...QhLy from a sending address of be1qeujw...36t5 via transaction hash:

ee4b24ld4c07142blc7eda5e47fb5657d554aeb323d89df0102fl34e54dd8122.

75.    At the time of the transfer, the approximate U.S. Dollar (USD) value of 0.15646002 BTC was $10,320.93.

76.    FALAJU was further identified through government database searches with a place of birth in Lagos, Nigeria and an address in Kalamazoo, Michigan.

**G.    Tracing of Kraken Transfers to the TARGET ACCOUNT (approximately $10,000)**

77.    Kraken records show that on May 4, 2021, William GALLAGHER created account #AA11N84GK5ALM3XA (xM3XA), which contained several Bitcoin wallets, including one at wallet address:

be1qk4g890rjwl0zzm9q0g605tqvvnf6kzr8tdq5xn (be1qk4g8...q5xn).

78.    As mentioned above, GALLAGHER sent $10,000 in fiat currency from his Southern Bank & Trust account to GALLAGHER's Kraken account xM3XA on September 30, 2024. Kraken records confirm the transfer of $10,000 in fiat currency.

79.    These funds were eventually transferred to the TARGET ACCOUNT via the following transactions:

a.  On October 7, 2024, at 22:47 UTC, 0.15723561 BTC was withdrawn from GALLAGHER's Kraken account xM3XA and sent to GALLAGHER's Bitcoin wallet be1qk4g8...q5xn via transaction hash:

bd54fae1b2a39ablba1e754806dfd86dl831877007cb0baf773af7c556ad4fa4.

b.  On October 7, 2024, at 23:01 UTC, 0.157235 BTC plus 0.0001 BTC was transferred from GALLAGHER's sending address be1qk4g8...q5xn to receiving address be1qzg0574ctl2jwrysengvvp4mqm6qyc7vruqvcr8 (be1qzz05...vcr8) via transaction hash:

eb162100690ble0d47268dbcfJc6f76db03a4f6980abe6414285fe5ec66d0d3b.

c.  On October 9, 2024, at 20:56 UTC, 0.157403 BTC was transferred from sending address be1qzz05...vcr8 to receiving address be1q0zswkcw3nf05x55w4vu94k2dek5uzeyvel652a (be1q0zsw...652a) via transaction hash:

e9cd6575lal5b2d5e25cfc1fl4a2700290a938ffJ54604374c23ce66d8a61dIa.

d.  On October 9, 2024, at 21:46 UTC, 0.15688225 BTC was transferred from sending address be1q0zsw...652a to receiving address be1qkf4qaqy9lfjr70ndce2kqg4xg3zz72jnrqf4a (be1qkf4q...qf4a) via transaction hash:

c870be2ab367c01b626db4b4f8089357efc38b55b0c36bfcae29c0c779069c9c.

e.  On October 14, 2024, at 14:26 UTC, 0.15653369 BTC was transferred from sending address be1qkf4q...qf4a to receiving address be1qeujwhd4jg4v0444cxmwr0j0h28fktpmx3336t5 (be1qeujw...36t5) via transaction hash:

b25c8665ade44eae37fD6922da03480fd66cd6432a21557e2el4c76dc46c0960.

f.  On October 14, 2024, at 14:46 UTC, 0.15650522 BTC was transferred from sending address be1qeujw...36t5 receiving address 1 FcGG22A...QhLy (the TARGET ACCOUNT) via transaction hash:

ee4b241d4c07142blc7eda5e47fb5657d554aeb323d89dfD102f134e54dd8122.

80. A diagram showing this tracing is attached as Exhibit A.

### H.    Tracing of Coinbase Transfers to the TARGET ACCOUNT (approximately $40,000)

81.    Coinbase records obtained by investigators showed that, on July 3, 2019, William GALLAGHER created Coinbase User ID 5d1c9cc615b3bf58e6a2600a (x600a).

82.    As previously mentioned, GALLAGHER sent $15,000 on September 30, 2024, and $40,000 on October 1, 2024, from his Southern Bank & Trust account to Coinbase.

83.    Coinbase records confirm that on October 1, 2024, at 14:31 UTC, $40,000 in fiat currency was deposited into GALLAGHER's Coinbase User ID x600a account from Southern Bank account x0598.

84.    Per Coinbase records, on October 2, 2024, at 9:36 UTC, GALLAGHER's Coinbase User ID x600a account purchased 0.63237352 in Bitcoin for $39,990 USD. These funds were eventually transferred to the TARGET ACCOUNT via the following transactions:

    a.    On October 2, 2024, at 13:40 UTC, 0.61802226 BTC was transferred from GALLAGHER's Coinbase User ID x600a account to receiving address bc1qk4g8...q5xn (GALLAGHER's Bitcoin wallet held by Kraken) via transaction hash:

        ca4466be5c5c650614bcee6149c3de775bef0c3b302c6afl6a212723264ee77b.

    b.    On October 2, 2024, at 15:08 UTC, 0.61281591 BTC was transferred from sending address bc1qk4g8...q5xn to receiving address bc1qeujw...36t5 via transaction hash:

        6bfc8c898642469c2e66094c5854d59c2570b6edd2912e8123ce6ac57e35272a.

    c.    On October 2, 2024, at 18:24 UTC. 0.61281139 in Bitcoin was transferred from sending address bc1qeujw...36t5 to receiving address

1FcGG22A...QhLy (the TARGET ACCOUNT) via transaction hash:

216e4308ea4c53bf01ced9a4175565af3de42366e5dd87017c22b0c7834ca6a9.

85.     A diagram showing this tracing is attached as Exhibit B.

**I.      Tracing of Gemini Transfers to the TARGET ACCOUNT
(approximately $128,000)**

86.     Per Gemini records, all of the $483,000 in fiat currency deposited in
GALLAGHER's Gemini account was used to purchase 8.7564 BTC, which was
subsequently withdrawn and transferred to receiving address
1EEjsgARMhao5d2ixxiXsgntg1bQnKF4aK (1EEjsgAR...F4aK) via six transfers
between January 6 and July 19, 2024.

87.     These BTC withdrawals funded subsequent transfers to virtual
currency exchanges such as Binance, VALR, and THORSwap, ultimately resulting in
approximately $128,000 worth of cryptocurrency being transferred to the TARGET
ACCOUNT (see Exhibit C).

88.     Gemini records confirmed that the following transfers were made from
GALLAGHER's Gemini Account number 7666547 to cryptocurrency deposit address
1EEjsgARMhao5d2ixxiXsgntglbQnKF4aK (1EEjsgAR...F4aK):

a.      On January 6, 2024, at 11:10 UTC, approximately 2.242 BTC was
transferred to receiving address 1EEjsgAR...F4aK via transaction hash:

0277e0687blda9b4209e082ccb7f5f5fab838de0a2097d56133aa8a5da002be6.

b.      On January 9, 2024, at 20:10 UTC, approximately 1.252 BTC was
transferred to receiving address 1EEjsgAR...F4aK via transaction hash:

bd4822350f87fb40be84b7e2123d3fbac602cd64e3fdd405339b8340d6aad75a.

c.  On July 3, 2024, at 22:20 UTC, approximately 1.1 BTC was transferred to receiving address 1EEjsgAR...F4aK via transaction hash:

dea206f9a95f330b15c68b3df38dee0302e39be89bIe2a4bc495aed69f9bf858.

d.  On July 8, 2024, at 14:10 UTC, approximately 2.415 BTC was transferred to receiving address 1EEjsgAR...F4aK via transaction hash:

7b3478344fd653d76766baf82811167eb97b51a6baf4d8803bl234alal0cc67c.

e.  On July 15, 2024, at 22:45 UTC, approximately 1.549 BTC was transferred to receiving address 1EEjsgAR...F4aK via transaction hash:

dallb5lbe46b863a220e6ceae537789ff2e2a9fDcl3ac121bfbd4165173fl7d4.

f.  On July 19, 2024, at 14:20 UTC, approximately 0.198 BTC was transferred to receiving address 1EEjsgAR...F4aK via transaction hash:

95b4ef25e30dec8549c58f53cfe203b5f95ba2c7ca716f939c28e7c1864dd0fl.

89.  Per blockchain analysis conducted by investigators, the following transactions—ultimately to the TARGET ACCOUNT—were subsequently recorded on the blockchain:

a.  On July 3, 2024, at 11:28 PM UTC, approximately 1.097 BTC was transferred from sending address 1EEjsgAR...F4aK to receiving address bc1qqhqyc5vlfg3we68lkph98uqfqg822dvpelqj66 (bc1qqhqy...qj66) via transaction hash:

cdf3I92355be2d52b8a72721d1db167be7308b60effb901IOIf829c855c420f9.

b.  On July 4, 2024, at 12:07 AM UTC. approximately 1.097 BTC was transferred from sending address bc1qqhqy...qj66 to receiving address bc1qhtvvgdhe31fzqn5vh284ewv87tkr9ky9gr38q3 (bc1qhtvv...38q3) via transaction hash:

e0e1febd0fcc2ecf4fcf5402899fec5 I a4cda9 l 5e3bc86902c6 f9624e607c7a5.

c.    On July 4, 2024, at 12:27 AM UTC, approximately 1.097 BTC was transferred from sending address bc1qhtvv...38q3 to receiving address 1FcGG22A...QhLy (the TARGET ACCOUNT) via transaction hash:

78cl81b4de0fe68d973al7a34b96100acbcc2e2fb8bf777a91fc226025e67a2e.

d.    On July 15, 2024, at 11:18 PM UTC, approximately 1.004 BTC was transferred from sending address 1EEjsgAR...F4aK to receiving address bc1qyufdlv0peu357evd593e364atrqdve7k8xsy98 (bc1qyufd...sy98) via transaction hash:

8d33689ad3bc6d47eef1067lad2alabeae00d6033966247552da6d63e881f268.

e.    On July 16, 2024, at 1:14 AM UTC, approximately 1.004 BTC was transferred from sending address bc1qyufd...sy98 to receiving address bc1qhtvv...38q3 via transaction hash:

03ad5c9eb5f86eclle4aaa4de0c7452b7aef8ab5c963c4701ac401899d36db6a.

f.    On July 16, 2024, at 1:50 AM UTC, approximately 1.004 BTC was transferred from sending address bc1qhtvv...38q3 to receiving address 1FcGG22A...QhLy (the TARGET ACCOUNT) via transaction hash:

588fbd626230509c43c703f7a39d08f2e8dcda9c4lee84cle5ef5b743726bc48.

90.    In summary, BTC was withdrawn from GALLAGHER's Gemini account and subsequently funded deposits of 1.097482 BTC into TARGET ACCOUNT on July 4, 2024, and 1.004 BTC on July 16, 2024.

91.    On the dates of deposit, the USD values were equivalent to approximately $62,532 and $65,378 respectively, for a total of $127,910.

92.    The total amount of victim funds traced to the TARGET ACCOUNT was approximately $178,000.

93.     Blockchain analysis conducted by investigators tracing the flow of funds out of the TARGET ACCOUNT identified additional activity that is also indicative of money laundering.

94.     Within one hour of the July 4, 2024, deposit of BTC into the TARGET ACCOUNT, the BTC was subsequently traded for 63,116.88 USDT within Binance.us and then withdrawn via a blockchain transfer.

95.     Similarly, within three hours of the July 16, 2024, deposit of BTC into the TARGET ACCOUNT, the BTC was subsequently traded for 65,075.04 USDT within Binance.com and then withdrawn via a blockchain transfer.

96.     On July 16, 2024, and October 25, 2024, two withdrawals from the TARGET ACCOUNT—totaling approximately 105,215 USDT attributable to victim funds—were sent to deposit address 0x644dff3edf8db585552b0fff5ae30acd17f375aa.[2]

### J.     Target Account Used to Facilitate Money Laundering

97.     Blockchain tracing and analysis revealed that the TARGET ACCOUNT received proceeds from VICTIM #1 through transfers and exchanges of the funds through various digital addresses, including changes from one type of virtual currency to another.

98.     The TARGET ACCOUNT did not receive VICTIM #1's funds through direct transfers from GALLAGHER's identified accounts at the three different cryptocurrency exchanges mentioned above (Kraken, Coinbase, and Gemini).

---

[2] In FALAJU's Claim and in his Petition, both submitted June 21, 2025, he affirms that that he owns deposit address "0x644dFF3eDf8dB585552B0FFF5aE30aCd17f375aA," that it was linked to his Binance account, and that it was "blacklisted/ban [sic] and rendered inactive."

Instead, the TARGET ACCOUNT received VICTIM #1's funds from GALLAGHER's three accounts in circuitous fashions that passed through many different digital addresses, which is indicative of common control or a planned disposition of those funds.

99.    The transferring and exchange of different virtual currencies across multiple addresses in an apparently-coordinated manner is evidence of an intentional effort to transfer or transmit proceeds of a specified unlawful activity ("SUA'")—namely, wire fraud—to conceal or disguise the nature, location, source of ownership, or control of SUA proceeds. Absent coordination, routing victim proceeds in the manner described above would be a very unlikely event.

100.    In addition, the exchange of different types of virtual currencies in conjunction with the transfer of victim funds is indicative of an attempt to complicate the tracing of those funds and hide their source, nature, and ownership, among other things. The circuitous routing of victim funds to the same TARGET ACCOUNT, as well as the rapid deposit and withdrawal of virtual currency in and out of the TARGET ACCOUNT, support the conclusion that the TARGET ACCOUNT is involved in and being used to facilitate a money laundering scheme through which the proceeds of romance fraud schemes are being laundered.

### K.    Seizure of the Defendant Property

101.    The FBI obtained a civil seizure warrant for the TARGET ACCOUNT on May 27, 2025.

102.    Prior to obtaining the civil seizure warrant, the FBI asked Binance to voluntarily restrain or freeze funds in the TARGET ACCOUNT. Binance confirmed that the account was frozen on or about April 17, 2025.

103.    On or about May 24, 2025, FALAJU contacted the FBI to try to find out why the TARGET ACCOUNT (in his name) was frozen.

104.    FALAJU was told the FBI wanted to speak to him in person to discuss the matter, the nature of the account, and why it was frozen.

105.    FALAJU declined to speak to the FBI in person.

106.    The FBI attempted an administrative forfeiture of the TARGET ACCOUNT.

107.    On June 21, 2025, FALAJU filed an electronic claim contesting the forfeiture of the TARGET ACCOUNT.

108.    On June 21, 2025, FALAJU filed an electronic petition for remission or mitigation for the seized TARGET ACCOUNT.

109.    In the documents attached to his claim and petition, FALAJU did not provide records for the TARGET ACCOUNT.

### V.    COUNT ONE
### FORFEITURE UNDER 18 U.S.C. § 981(a)(1)(A):
### CONCEALMENT MONEY LAUNDERING

110.    Plaintiff repeats and realleges each and every allegation set forth above.

111.    Plaintiff believes the Defendant Property constitutes personal property involved in a financial transaction with the proceeds of some form of unlawful activity conducted or attempted to be conducted with knowledge that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source,

the ownership, or the control of the proceeds of a specified unlawful activity, and/or constitutes property traceable to such property, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

112.   As a result of the foregoing, the Defendant Property is forfeitable to the Plaintiff under 18 U.S.C. § 981(a)(1)(A).

## VI.    COUNT TWO
### FORFEITURE UNDER 18 U.S.C. § 981(a)(1)(A):
### MONETARY TRANSACTION OVER $10,000 WITH PROPERTY DERIVED FROM A SPECIFIED UNLAWFUL ACTIVITY

113.   Plaintiff repeats and realleges each and every allegation set forth above.

114.   Plaintiff believes the Defendant Property constitutes personal property involved in a monetary transaction in criminally derived property of a value greater than $10,000, that is derived from a specified unlawful activity, and/or constitutes property traceable to such property, in violation of 18 U.S.C. § 1957(a).

115.   As a result of the foregoing, the Defendant Property is forfeitable to the Plaintiff under 18 U.S.C. § 981(a)(1)(A).

## VII.    CONCLUSION

WHEREFORE, Plaintiff requests the foregoing property be civilly forfeited and such other relief to which it is entitled under applicable law.

Respectfully Submitted,

Richard D. Westphal
United States Attorney

By: _/s/ Craig Peyton Gaumer_
    Craig Peyton Gaumer
    Assistant United States Attorney
    U.S. Attorney's Office
    210 Walnut Street, Suite 455
    Des Moines, IA 50309
    Tel: (515) 473-9300
    Fax: (515) 473-9292
    Email: craig.gaumer@usdoj.gov

## VERIFICATION

I, Matthew R. Thatcher, hereby verify and declare under penalty of perjury that I am a Special Agent of the Federal Bureau of Investigation, and that I have read the foregoing Verified Complaint *in Rem*, *United States v.* 275,912.256745 *Tether, Valued At Approximately $275,912.26* and know the contents thereof and the matters contained in the Verified Complaint are true to my own knowledge, except for those matters not within my own personal knowledge and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds for my belief are the official files and records of the United States and information provided to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

Dated: August 16, 2025.

_____
Matthew R. Thatcher, Special Agent,
Federal Bureau of Investigation